UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DOW AGROSCIENCES LLC, | ) | |
|       Plaintiff, | ) | |
| | ) | |
|    vs. | ) | 1:03-CV-0654-SEB-JPG |
| | ) | |
| CROMPTON CORPORATION and | ) | |
| UNIROYAL CHEMICAL COMPANY, | ) | |
| INC., | ) | |
|       Defendants. | ) | |

## ENTRY ON CLAIM CONSTRUCTION GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

This matter comes before the Court requiring us to construe a certain patent term integral to the underlying infringement action.  Plaintiff Dow Agrosciences LLC ("Dow") and Defendants Crompton Corporation ("Crompton") and Uniroyal Chemical Company ("Uniroyal") (collectively "Defendants") have each presented proposed constructions of the term "alkoxy," as we applied the term to Claim 1 of U.S. Patent No. 4,697,044 ("the '044 patent"); Claim 1 of U.S. Patent No. 4,833,151 ("the '151 patent"); and Claims 1, 2, 3, and 4 of U.S. Patent No. 5,142,064 ("the '064 patent") in our May 12, 2004, entry on claim construction following a *Markman* hearing.

The parties are back before the Court, each seeking partial summary judgment on the issue of literal infringement premised on their respective constructions of the disputed term, "alkoxy."  Plaintiff moves for partial summary judgment on the additional issue of

infringement under the doctrine of equivalents, again premised on our adoption of

Plaintiff's construction of the disputed term, "alkoxy."

     Having fully considered the parties' arguments and, based on the analysis

discussed below, we adopt Plaintiff's construction of the disputed term "alkoxy" and

accordingly <u>GRANT</u> Plaintiff's Motion for Partial Summary Judgment on the questions

of literal infringement and infringement under the doctrine of equivalents.[1]  Defendants'

Motion for Partial Summary Judgment is <u>DENIED</u>.

Factual and Procedural Background

We incorporate by reference here the factual summary and legal analysis detailed

in our May 12, 2004, entry on the *Markman* claim construction.  <u>See Dow Agrosciences</u>

<u>LLC v. Crompton Corp.</u>, 2004 WL 1087362 (S.D. Ind. 2004).

Defendants allege that two compounds in pesticides as produced by Plaintiff,

noviflumuron and hexaflumuron, infringe the following claims of the patents in suit:

claims 1, 2, 3, 4, 6, and 7 of the '044 patent; claims 1, 2, 4, 5, and 6 of the '151 patent;

and claims 1-4 of the '064 patent (collectively, the "asserted claims").  Defendants'

Answer and Counterclaims, April 28, 2004 (Dkt. 83).  Each of the asserted claims either

---

[1] We do not resolve in this order Plaintiff's Motion for Summary Judgment directed towards Defendants' counterclaims (Dkt. 122).  In light of our ruling on claim construction and our ruling on the cross-motions for partial summary judgment, however, the following related pending motions are hereby **DENIED** as moot**:** Defendants' two motions for protective orders to prohibit further depositions (Dkt. 136, Dkt. 138), Plaintiff's Motion to Exclude Testimony of Defendants' Experts (Dkt. 146), Defendants' Motion to Limit Expert Testimony of Mark A. Lipton, Ph.D. (Dkt. 150), Defendants' Motion for Leave to File Supplementary Declarations (Dkt. 174), Plaintiff's Motion in Limine (Dkt. 191), and Defendants' Motions in Limine (Dkt. 195-202).

2

itself contains the term "substituted phenyl group," or is dependent on a claim that

contains the term, "substituted phenyl group."  See '044 patent (claims 1-4, 6 and 7); '151

patent (claims 1,2 and 4-6); and '064 patent (claims 1-4).

In our May 12, 2004, entry, we construed the meaning of the term "substituted

phenyl group" as follows:

> a phenyl group that is substituted at 1-5 positions where any and all
> substitutions must be chosen from the group consisting of: a) 1-3
> halogen atoms, b) 1-2 alkyl groups, possibly substituted with
> halogen, hydroxy, alkoxy, alkylthio, dialkyl amino alkylsulphonyl
> and phenyl, c) tri- or tetramethylene, d) a cycloalkyl group, possibly
> substituted with halogen or cyano, e) 1-2 nitro groups or cyano
> groups or alkoxy groups, f) a dioxymethylene or dioxyethylene
> group, g) an acyl group, which may be substituted with halogen, h)
> an alkyl sulfonyl, phenyl sulfonyl, alkylthio, phenylthio or phenoxy
> group, which groups may be substituted with halogen, I) a
> sulfonamide group, which may be alkylated, [j not used] and k) a
> phenyl group, which may be substituted with halogen, nitro, cyano
> and halogenated alkyl

Dow, 2004 WL 1087362, *12.

The structure of hexaflumuron is not in dispute between the parties and is depicted

as

follo

ws:

Declaration of Mark A. Lipton (.Lipton Decl..) (App. D) at ¶ 4.

The substituted phenyl group of hexaflumuron is substituted at three positions.  Id. at ¶ 6.  Two of the substituents are chlorine, which is a halogen, and are encompassed in subsection (a) of column 2 of our previously construed definition of "substituted phenyl group."  The other substituent is a tetrafluoroethoxy group,  more generally considered an alkoxy group that is substituted with halogen atoms.  Id. at ¶ 7.

The structure of noviflumuron is not in dispute between the parties and is depicted as follows:



Id. at ¶ 5.

The substituted phenyl group of noviflumuron is substituted at four positions.  Id. at ¶ 9.  Two of the substituents are chlorine, and one of the substituents is fluorine, all of which are halogens and encompassed in subsection (a) of column 2 of our previously

construed definition of "substituted phenyl group."  Id.  The other substituent is a

hexafluoropropoxy group, more generally considered as an alkoxy group substituted with

halogens.  Id. at ¶ 10.

The parties' dispute revolves around whether the halogen substituted alkoxy side

chains in hexaflumuron and noviflumuron are encompassed within subsection (e) of

column 2 of our previously construed definition of "substituted phenyl group."

Plaintiff argues that an "alkoxy group," as used in the definition of a substituted

phenyl group, is understood by one of ordinary skill in the art[2] to consist of an alkyl

group, consisting of only carbon and hydrogen (also referred to as an "unsubstituted"

alkyl group), bonded to a single oxygen atom; (this combination is also referred to as an

"unsubstituted" alkoxy group).

Defendants argue that the alkoxy side chains of hexaflumuron, and noviflumuron

are within the definition of the term "alkoxy," as that term is used in column 2 of the

patents, and as understood by those of ordinary skill in the art.[3]  Specifically, Defendants

_____

[2]  In this case, the parties agree that one of ordinary skill in the art would be a person with
a bachelor's degree in Chemistry.  See Dow, 2004 WL 1087362, *7 n.6.

[3] Defendants specifically reference:

those of ordinary skill in the art of the invention of the patents; by the
community of chemists; by Dow's entomologist, Dr. Karr, as well as other
Dow technical personnel; by Dow's expert chemist, Dr. Lipton; by Dr.
Lipton's doctorate and post-doctorate professors; in chemical textbooks
used at Purdue University and the  Massachusetts Institute of Technology;
in the classification system of the U.S. Patent and Trademark Office; and
by others.

5

contend that the definition of alkoxy consists of an alkyl group, which may be an unsubstituted alkyl group or which may have one or more of its hydrogen atoms substituted for another atom or molecule (also referred to as a "substituted" alkyl group), bonded to a single oxygen atom (the combination is also referred to as an "substituted" alkoxy group if it incorporates a substituted alkyl group).

Legal Issues

I.      <u>Summary Judgment Standard</u>.

In a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).  After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment.  <u>Id.</u> at 322-23.  "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her."  <u>Waldridge v. American Hoechst Corp.</u>, 24 F.3d 918, 920 (7th Cir. 1994), (citing <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 585-87 (1986); <u>Celotex</u>, 477 U.S. at 322-24; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-52 (1986)).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle

---

<u>See</u> Defs.' Response Brief at 9.

for resolving factual disputes. <u>Waldridge</u>, 24 F.3d at 290. Therefore, in considering a

motion for summary judgment, we draw all reasonable inferences in favor of the non-

movant. <u>Venters v. City of Delphi</u>, 123 F.3d 956, 962 (7th Cir. 1997). If genuine doubts

remain and a reasonable fact-finder could find for the party opposing the motion,

summary judgment is inappropriate. <u>See</u> <u>Shields Enters., Inc. v. First Chicago Corp.</u>, 975

F.2d 1290, 1294 (7th Cir. 1992); <u>Wolf v. City of Fitchburg</u>, 870 F.2d 1327, 1330 (7th Cir.

1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements

necessary to establish his or her case, summary judgment is not only appropriate, but

mandated. <u>See</u> <u>Celotex</u>, 477 U.S. at 322; <u>Waldridge</u>, 24 F.3d at 920. A plaintiff's

self-serving statements, unsupported by specific concrete facts reflected in the record,

cannot preclude summary judgment. <u>Albiero v. City of Kankakee</u>, 246 F.3d 927, 933 (7th

Cir. 2001); <u>Slowiak v. Land O'Lakes, Inc.</u>, 987 F.2d 1293, 1295 (7th Cir. 1993).

The parties' respective motions for partial summary judgment advance their

respective claim construction theories, each maintaining that if we adopt its claim

construction arguments, it will be dispositive of the related legal issues in this litigation.

Accordingly, we move to a discussion of the salient matter of claim construction.

<u>Discussion</u>

I.    <u>Claim Construction</u>[4]

---

[4] Defendants have presented the Court with a qualified request for additional briefing and
a second *Markman* hearing, which apparently would only be "necessary" if we intend to adopt a
claim construction definition adverse to the definition Defendants have advanced. However,
Defendants have not presented any controlling legal authority that they are entitled to additional
briefing or another *Markman* hearing. Moreover, based on the intrinsic evidence, the evidence

As we have previously noted, and as is clear from well-settled principles of law, claim construction is "the process of giving proper meaning to the claim language," the fundamental process that "defines the scope of the protected invention." Abtox, Inc. v. Exitron Corp., 122 F.3d 1019, 1023 (Fed. Cir. 1997). Because the scope of a claim is necessarily determined by the language of the claim, claim construction analysis must begin with these words. Teleflex, Inc. v. Ficosa North America Corp., 299 F.3d 1313, 1324 (Fed. Cir. 2002); Markman v. Westview Instr., Inc., 52 F.3d 967, 976 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996). The words used in the claims are interpreted in light of the intrinsic record evidence, including written description, drawings, and the prosecution history, if in evidence. Teleflex, 299 F.3d at 1324. Absent an express intent to impart a novel meaning to claim terms, there exists a "heavy presumption" that a claim term carries its ordinary and customary meaning. Id. at 1325; see also Abbott Labs. v. Novopharm Ltd., 323 F.3d 1324, 1330 (Fed. Cir. 2003) (allowing the entry of a definition of a claim term other than its ordinary and customary meaning where the patentee "has chosen to be his or her own lexicographer by clearly setting forth an explicit definition for a claim term").

The ordinary meaning of a claim term may be divined by reviewing a variety of

---

presented at the initial *Markman* hearing, and the parties' submissions in conjunction with their respective motions for partial summary judgment, there is no need for the Court to convene to rehear their arguments and evidence. Defendants' stated belief that further argument is necessary only if the Court is inclined to rule in Plaintiff's favor suggests that their request for a second *Markman* hearing is motivated primarily by their desire to have a last ditch opportunity to avert judicial disaster. Accordingly, we deny Defendants' request for additional briefing and a second *Markman* hearing.

sources, including the claims themselves, other intrinsic evidence including the written description and the prosecution history, and extrinsic evidence such as dictionaries and treatises. <u>Teleflex</u>, 299 F.3d at 1325 (citations omitted).  Among all types of intrinsic evidence, courts have indicated that the specification is the "single best guide to the meaning of a disputed term." <u>Vitronics, Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The specification is "a written description of the invention and the manner and process of making and using the same."  United States Patent Office online glossary (obtained at <u>http://www.uspto.gov/main/glossary/index.html#s</u>). While a claim must be read in light of its specification, particular formulations or examples appearing in the specification may not be read to limit the claim.  <u>Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.</u>, 261 F.3d 1329, 1338-39 (Fed. Cir. 2001).  Nor may a specification be read to expand the scope of the claim.  <u>SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc</u>, 242 F.3d 1337, 1341 (Fed. Cir. 2001); <u>Novo Nordisk of N. Am. v. Genentech</u>, 77 F.3d 1364, 1369 (Fed. Cir. 1996); <u>Transmatic, Inc.</u>, 53 F.3d at 1278. In all cases, the ordinary meaning must be determined from the standpoint of a person of ordinary skill in the relevant art.  <u>Teleflex</u>, 299 F.3d at 1325.

"Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." <u>Markman</u>, 52 F.3d at 980.  In its discretion, a court may receive extrinsic evidence to aid in understanding the patent.  <u>Id.</u>  However, if the meaning of the claim terms is unambiguous, and the court can determine that meaning from the intrinsic evidence, it

need not rely on extrinsic evidence in construing the claim. Vitronics, Corp., 90 F.3d at 1583.

      A.    *Intrinsic Evidence.*

      As directed by the Federal Circuit, we look first to the language of the patents in our effort to determine the meaning of "alkoxy." Based on the language in Defendants' patents, we conclude that someone with a bachelor's degree in chemistry would clearly interpret and understand the term "alkoxy" to exclude substituted variations. Four separate aspects of Defendants' patents dictate this conclusion: (1) the language of the patents' claims; (2) the language of the patents' specifications; (3) the treatment of a structurally-similar substituent group; and (4) the prosecution history. We address each factor below.[5]

_____

    [5] Defendants contend that in our prior claim construction ruling we adopted as the law of this case the district court's decision in Bayer Aktiengesellschaft v. Duphar Intern. Research B.V., 221 U.S.P.Q. 1056 (D. D.C. 1983). See, e.g., Defs.' Reply Brief at 10 (stating: "It is Uniroyal's position that the Bayer case was considered by this Court and is therefore the law of this case"). Defendants are mistaken about this, however, as we neither expressly nor implicitly adopted the Bayer ruling as the law of this case.

    Assuming *arguendo* that Bayer is the law of this case, the Bayer ruling does not resolve the proper construction of the disputed term, "alkoxy." In fact, on appeal the Federal Circuit specifically declined to rule whether Defendants' patents encompass substituted alkoxy groups. The Federal Circuit determined that this issue had not been raised at the trial court level:

> Duphar interprets the phrase in the specification "If R sub2 is a substituted phenyl group, the phenyl group contains at least one substituent chosen from the group consisting of [groups (a)-(k)]:" to mean that the enumerated substituents in groups (a)-(k), none of which include -OCF sub3 , are the only possible substituents for the phenyl group. We, however, find this contention to be meritless. The record does not support Duphar's contention that it presented this theory at trial. The only reference to this theory is in its Proposed Findings of Fact.

1.    *Language of the patents' claims.*

We turn first to the express language of the claims themselves to determine if it sheds any light on the intended meaning of "alkoxy."  Though the claims do not *explicitly* indicate whether the term "alkoxy" includes substituted as well as unsubstituted variations, we see that the terms for other substituent groups mentioned in the claims repeatedly distinguish between substituted and unsubstituted variations.  For example, claim one (1) of the '064 patent states:

> R1 is . . . an alkyl group, a halogen substituted alkyl groupk [sic], an alkoxy substituted alkyl group, an alkythio substituted alkyl group, a cyano substituted alkyl group, . . . a benzyl group, a halogen substituted benzyl group . . .
>
> R2 is a substituted or non-substituted phenyl group; . . .

'064 Patent, Col. 29, row 9 - 15.  Similarly, claim two (2) of the '064 patent includes the following provision:

> R2 represents an unsubstituted phenyl group or a phenyl group substituted with from [sic] 1-3 substituents selected from the group consisting of from [sic] . . . A C1-15 alkyl group, a halogenated C1-15 alkyl group, a phenyl substituted C1-15 alkyl group, a cycloalkyl group, a halogenated cycloalkyl group, . . .

'064 Patent, Col. 30,  21-27.  <u>see also</u>,  claim 3, claim 4 (incorporating identical language).

In each of these four claims, Defendants have distinguished between the

---

Bayer Aktiengesellschaft v. Duphar Intern. Research B.V., 738 F.2d 1237, 1240-41 (Fed. Cir. 1984).  Therefore, regardless of Defendants' contrary belief, the <u>Bayer</u> ruling has no relevance to the claim construction issue now before us.

substituted and unsubstituted variations of alkyl, cycloalkyl, benzyl, and phenyl groups by initially listing the substituent group itself followed by several substituted varieties of the substituent group.  If, as Defendants contend, the definitions of these four substituent groups were sufficiently expansive to encompass substituted variations (which is the construction Defendants urge us to adopt for the term "alkoxy"), there seemingly would be no need to list the possible substitutions separately, since listing substitutions would be redundant.

Thus, the only coherent reading of these claims that gives meaning to all the words is that, when possible substitutions to a substituent group are specifically listed, the patent claims encompass such substitutions.  Conversely, when the name of a substituent group is not embellished or expanded by any possible substitutions, then no substitutions are encompassed.  See Unique Concepts, Inc. v. Brown, 939 F.2d 1558, 1562 (Fed. Cir. 1991) (adhering to the rule that "[a]ll the limitations of a claim must be considered meaningful"); see also Advanced Communication Design, Inc. v. Premier Retail Networks, Inc., 46 Fed. Appx. 964, 980-81 (Fed. Cir. 2002) (stating that "the construction of any legal document--like a statute, contract or patent--should try to give meaning to every term in that document; otherwise, a lawyer or court will have erred by reading the chosen words of the document into oblivion").  To construe the claims otherwise would render meaningless the numerous possible substitutions specifically listed in the patent.

Defendants have not presented any coherent rationale for treating the disputed term "alkoxy" differently from the references for other substituent groups; indeed, their

patents are devoid of any indication that the term "alkoxy" is unique in this regard. Clearly, the term "alkoxy" is to be construed in a manner consistent with the references for other substituent groups.

For these reasons, we reject Defendants' proposed construction of the term "alkoxy" because it is inconsistent with other portions of the claims and would render major provisions redundant.[6]  In contrast, Dow's construction of the term "alkoxy" is consistent with the way Defendants have referenced other substituent groups in the claims.  Accordingly, from this analysis, we conclude that the language of Defendants' claims indicates that the name of a substituent group, used by itself without reference to possible substitutions such as "alkoxy group," must be read restrictively to exclude substituted variations.

2.  *Language of the patent specification.*

A thorough examination of Defendants' patents' specifications[7] also supports a restrictive construction of the term, "alkoxy."  We accept the specification as the "single best guide to the meaning of a disputed term," <u>Vitronics</u>, 90 F.3d at 1582, and note that the specification here strongly implies that, unless otherwise modified, the term "alkoxy,"

---

[6] If the generic name for a substituent group includes substitutions, there is no need to list the possible substitutions separately for the alkyl, cycloalkyl, benzyl, and phenyl groups.

[7] The relevant language in each patents' specification is the same.  Technically, in the context of this case, the term "specification" should be referenced in plural form because the three patents at issue each incorporates its own specification.  However, because the three specifications are identical in the relevant parts, we use the term specification in singular form throughout this entry.

as used in this patent, does not include substituted variations.  In the relevant portion of the specification,[8] Defendants clearly and repeatedly distinguished which substituent groups could be substituted.  In subpoints (b), (d), (g), (h), and (k), for example, Defendants explicitly referenced that the included substituent groups could be substituted.  Likewise, in subpoint (i), Defendants include a potential variation that a listed substituent group may possess.  In total, six of the eight subpoints which contain substitutable substituent groups (excluding the disputed term "alkoxy") list potential substitutions for those groups.[9]

As a result, the patents' specification strongly indicates that when Defendants wanted their patents to cover a substituted substituent group, they listed the substitutions and, by logical extension, when the patent did not encompass such substitutions, no substitutions were listed.  To read the specification otherwise, as Defendants assert in their construction for the disputed term "alkoxy," would render large portions of the specification redundant.[10]  We view Dow's construction of the term "alkoxy" to correspond to Defendants' use of other terms for substituent groups in the specification.  See Unique Concepts, 939 F.2d at 1562; Advanced Communication Design 46 Fed.

---

[8] We refer to the portion of the specification which we adopted in our previous entry on claim construction.  See Dow Agrosciences LLC v. Crompton Corp., 2004 WL 1087362 (S.D. Ind. 2004).

[9] The substituents in subpoint (a) cannot be substituted, and, excluding alkoxy groups, the remaining substituent groups listed in subpoint (e), nitro and cyano, cannot be substituted.

[10] Again, if the generic name for a substituent group includes substitutions, there is no need to list the possible substitutions separately in subpoints (b), (d), (g), (h), (I) and (k) .

Appx. at 980-81.

Accordingly, we conclude that the language of Defendants' specification suggests that the name of a substituent group, such as "alkoxy," requires a restrictive definition which excludes substituted variations, unless possible substitutions are specifically listed, which limitation is then also read into the patent claims. See SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc, 242 F.3d 1337, 1341 (Fed. Cir. 2001) (holding: "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent . . ."); Roberts Dairy Co. v. U.S., 530 F.2d 1342, 1352 (Ct. Cl. 1976) (concluding that a patentee is bound by his specification in interpreting his patent claims even when his specification requires a narrower interpretation of the claims than the patentee desires).

3.     *Treatment of similar substituent groups in the specification.*

In the patent specification, Defendants treated the term for a structurally-similar substituent group as including only unsubstituted variations. For example, in subpoint (h) of the relevant portion of the specification, Defendants explicitly mentioned that a "phenoxy" group could be substituted with halogen.[11]  This approach creates the critical inference that the term, "phenoxy," by itself, does not encompass substituted variations since explicit reference is made to possible substitutions. We conclude that a person with a bachelor's degree in chemistry would understand the definition of a "phenoxy" group to

---

[11] A phenoxy group has the same oxygen-connected-to-substituent-group structure as an alkoxy group.

be similar to the definition of an "alkoxy" group; thus, the fact that Defendants explicitly indicated in their patent that the structurally similar phenoxy group could be substituted strongly indicates that the proper construction for the disputed term "alkoxy" is similarly restrictive. Stated otherwise, a person of ordinary skill in the art would understand both the definition of "phenoxy" and the definition of "alkoxy" to exclude substitutions that are otherwise not listed.

      4.    *Prosecution history.*

      There is nothing in the prosecution history that indicates that Defendants intended their patents to encompass substituted alkoxy groups. An examination of the prosecution history reveals that Defendants never disclosed a substituted alkoxy group. In fact, Defendants' expert, Dr. Fu, conceded that, with respect to alkoxy groups, the patents only disclosed one unsubstituted alkoxy substituent group.[12] Defendants' failure to disclose substituted alkoxy substituents is another indication that their patents do not encompass substituted alkoxy groups.

      For the four, above-discussed reasons, we are persuaded that the most coherent understanding of Defendants' patents and prosecution history is that the unmodified[13] term, "alkoxy," does not include substituted variations. This interpretation is consistent with Defendants' use of the terms with respect to other substituent groups in their patents.

---

      [12] Dr. Fu stated the only disclosed alkoxy substituent group was a "methoxy substituted compound," which is an unsubstituted alkoxy. Pl.'s Surreply Ex. 2, Fu Dep. at 184-85, 47-48.

      [13] We use unmodified in the sense that no possible substitutions were listed.

Accordingly, we side with Dow in its reasoning, concluding that the proper construction of the disputed term, "alkoxy," excludes substituted variations.[14]

      B.     *Chemical Dictionaries.*

The construction of the disputed term, "alkoxy," gleaned from our reading of Defendants' patents, is bolstered by the definitions of "alkoxy" contained in chemical dictionaries. We note that the Federal Circuit has unambiguously endorsed resort to dictionaries to ascertain the ordinary and customary meaning of words used in patents.[15]

Dow cites two chemical dictionaries which it claims define "alkoxy" in a manner excluding substituted variations. The first dictionary, Hackh's Chemical Dictionary, contains the following relevant definitions:

---

[14] As we have previously noted, the expansive definition advanced by Defendants would either render large portions of their claims and specification redundant, or would require us to define "alkoxy" in a fundamentally different manner than the terms for other substituent groups (and in a manner not supported by the prosecution history).

[15] The Federal Circuit has explained: "It has been long recognized in our precedent and in the precedent of our predecessor court, the Court of Customs and Patent Appeals, that dictionaries, encyclopedias and treatises are particularly useful resources to assist the court in determining the ordinary and customary meanings of claim terms." Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202 (Fed. Cir. 2002) (citing Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1325, 63 USPQ2d 1374, 1380 (Fed. Cir. 2002) ("The ordinary meaning of a claim term may be determined by reviewing a variety of sources, including ... dictionaries and treatises ...." (internal citations omitted)); CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366, 62 USPQ2d 1658, 1662 ("[O]ur precedents show that dictionary definitions may establish a claim term's ordinary meaning."); Optical Disc Corp. v. Del Mar Avionics, 208 F.3d 1324, 1334-35, 54 USPQ2d 1289, 1295 (Fed. Cir. 2000) ("For such ordinary meaning, we turn to the dictionary definition of the term."); Quantum Corp. v. Rodime, PLC, 65 F.3d 1577, 1581, 36 USPQ2d 1162, 1166 (Fed. Cir. 1995) ("[W]e see no error in the district court's use of dictionary definitions to ascertain the ordinary meaning of the relevant claim limitation."); In re Ripper, 36 C.C.P.A. 743, 171 F.2d 297, 299, 80 USPQ 96, 98 (1948) ("[I]t is clear that in ascertaining the meaning of [the claim term] as it appears herein, reference properly may be made to the ordinary dictionaries.")).

> **alkoxy**.  An alkyl radical attached to the remainder of the molecule by oxygen; as, methoxy.

> **alkyl**.  CnH2n+1 – Alphyl, aphyl, A monovalent radical derived from an aliphatic hydrocarbon by removal of 1 H[ydrogen]; as methyl-, . . .

Hackh's Chemical Dictionary 27 (4th ed. 1969).  These two definitions together clearly reveal that the alkyl radical component of an alkoxy contains only carbon and hydrogen atoms.  Further, the Hackh definitions contain no mention of the possibility of substitutions in the alkyl radical.

The second dictionary cited by Dow, McGraw-Hill's Dictionary of Scientific and Technical Terms, also contains a narrow definition for an alkoxy group and its related components:

> **alkoxy** [ORG CHEM] An alkyl radical attached to a molecule by oxygen, such as the ethoxy radical.

> **alkyl** [ORG CHEM] An organic group that results from removal of a hydrogen atom from an acyclic, saturated, hydrocarbon; may be represented in a chemical formula by R–.

> **alkane** [ORG CHEM] A member of a series of saturated aliphatic hydrocarbons having the empirical formula CnH2n +2.

McGraw-Hill's Dictionary of Scientific and Technical Terms 64 (5th ed. 1994).[16]  As with the Hackh definition, McGraw-Hill's definition limits the alkyl radical to only carbon and hydrogen atoms.  Moreover, there is no indication or suggestion in the McGraw-Hill's definition that the term "alkoxy" can encompass substituted alkyl

---

[16] This edition slightly post-dates the '064 patent, which is dated August 25, 1992.

18

radicals.  Accordingly, based on the clear meaning of the term "alkoxy" in these dictionaries, we read the term not to encompass substituted alkyl radicals.[17]

Defendants maintain that the proper source to consult for a definition of "alkoxy" is the <u>International Union of Pure and Applied Chemistry</u> ("IUPAC") <u>Compendium of Chemical Terminology</u>.  In apparent support of their untethered construction of "alkoxy," Defendants note that IUPAC does not set forth a formal definition for this term.  In addition, Defendants place considerable reliance on the opinion of Dr. Alan McNaught ("Dr. McNaught"), head of the IUPAC Division of Chemical Nomenclature, who opines:

> The IUPAC Compendium of Chemical Terminology (the Gold Book - see <u>http://www.chemsoc.org/chembytes/goldbook/index.htm</u>) does not give a definition of alkoxy, but does list alkyl and various related terms (alkane, cycloalkyl, hydrocarbyl). I think that you could assume that alkoxy is equivalent to alkyl-O[xygen] for definition purposes.

Defs.' Reply Brief at 4 (citing Ex. 1, Dr. Lipton's Ex. 15).  Following Dr. McNaught's advice, we consulted the IUPAC <u>Compendium of Chemical Terminology</u> ourselves and found the following relevant definitions:

> <u>alkyl groups</u>
> Univalent groups derived from alkanes by removal of a hydrogen atom from any carbon atom $-C_nH_{2n+1}$. The groups derived by removal of a hydrogen atom from a terminal carbon atom of unbranched alkanes form a subclass of normal alkyl (n-alkyl) groups $H[CH_2]n$. The groups $RCH_2$, $R_2CH$ ® ¹ H), and $R_3C$ ® ¹ H) are primary, secondary and tertiary alkyl groups, respectively.

---

[17] We find Defendants' arguments against the clear language of these definitions unpersuasive.

19

> alkanes
> IUPAC Compendium of Chemical Terminology alkanes Acyclic
> branched or unbranched hydrocarbons having the general formula
> CnH2n+ 2, and therefore consisting entirely of hydrogen atoms and
> saturated carbon atoms. See also cycloalkanes. 1995, 67, 1313
> IUPAC Compendium of Chemical Terminology 2nd Edition (1997)

(Definitions obtained from http://www.chemsoc.org/chembytes/goldbook/index.htm.[18])

Similar to the Hackh and McGraw-Hill's definitions, the IUPAC definitions do not

encompass substituted alkyl groups.  In fact, since the IUPAC definition of an alkane

"consist[s] entirely of hydrogen atoms and saturated carbon atoms," the IUPAC

definitions are even clearer than the other two dictionaries' definitions in their explicit

exclusion of the possibility of substitutions.[19]  If we assume, as Defendants and Dr.

McNaught suggest we should, that the definition of alkoxy is "alkyl-O[xygen]," then, by

extension, the definition of alkoxy explicitly excludes substituted alkoxy groups.

Considered individually and collectively, these three definitions clearly indicate

that the formal definitions of alkane/alkyl/alkoxy do not include substituted alkyl

---

[18] All three definitions are authored by Dr. McNaught.

[19] In his declaration of September 24, 2004, Dr. McNaught curiously (at least to us) states
that "IUPAC has a recommended definition for the term 'alkyl groups,' which describes the
unsubstituted group but does not deal with the question of whether substituted alkyl groups are
excluded."  McNaught Dec. at ¶ 12.  If such an IUPAC definition exists, it has not been
presented to the Court in the context of this litigation.  Moreover, we are at a loss to reconcile
Dr. McNaught's editorial description of the IUPAC definitions with the actual language of the
definitions themselves, which explicitly defines an "alkyl group" as being formed by the removal
of a hydrogen atom from an "alkane," which is (in turn) defined  as "consisting entirely of
hydrogen atoms and saturated carbon atoms."  Therefore, despite Dr. McNaught's ruminations to
the contrary, we find the   definitions sufficiently clear in indicting that substituted variations are
not included in the formal definition of an alkane or alkyl group.

radicals/groups.[20]  Accordingly, we conclude that the ordinary and customary definition of "alkoxy" is an unsubstituted alkyl radical attached to the remainder of the molecule by oxygen which definition is consistent with the claim construction advanced by Dow.  This definition is further consistent with the construction of the term "alkoxy" as used in the Defendants' patents that we adopted previously based on the clear reading of the intrinsic evidence.

C.     *Extrinsic evidence.*

Because we have concluded that the intrinsic evidence in Defendants' patents clearly indicates that the disputed term "alkoxy" does not include substituted variations, and this definition is supported by a variety of chemical dictionaries, we conclude there is no need to consult further any other extrinsic evidence.  See  Vitronics, Corp., 90 F.3d at 1583.[21]  Accordingly, we decline the parties' invitation to consider the expert opinions,

---

[20] We also note that the restrictive definition of "alkyl" provided by the three dictionaries is consistent with Defendants' usage of that term in their patent claims.  See, supra, Section I (A)(1).

[21] We note that Federal Circuit precedent leaves unresolved the exact status of the use of dictionaries in claim construction.  Although dictionaries are technically extrinsic evidence, see Markman, 52 F.3d at 980, dictionaries are often treated by the Federal Circuit as if they were intrinsic evidence or, at least, a special class of extrinsic evidence more akin to intrinsic evidence, see supra note 14; Vitronics, Corp., 90 F.3d at 1584 n.6 (explaining: "Although technical treatises and dictionaries fall within the category of extrinsic evidence . . . [j]udges are free to consult such resources at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents").  Hopefully, much of the uncertainty under current case law surrounding the role of dictionaries will be resolved in a case currently pending before an en banc panel of the Federal Circuit.  See  Phillips v. AWH Corp., 376 F.3d 1382, 1383 (Fed. Cir. 2004) (specifically inviting the parties to submit additional briefing on several issues related to the use of dictionaries during claim construction).

articles, and other related submissions and deny the various motions related to the use of these submissions as moot.[22]

II.       Literal Infringement/Doctrine of Equivalents

Since the parties have not disputed any relevant facts regarding the accused product, that is, the molecular structure of hexaflumuron and noviflumuron, but have disagreed over possible claim interpretations, "the question of literal infringement collapses into claim construction and is amenable to summary judgment." General Mills, Inc. v. Hunt-Wesson, Inc., 103 F.3d 978, 983 (Fed. Cir. 1997) (citing Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1578 (Fed. Cir. 1996)).[23] We first address the question of literal infringement and then resolve the issue of the doctrine of equivalents.

A.       *Lack of literal infringement by hexaflumuron and noviflumuron of Defendants' patents.*

Our prior conclusion that Defendants' patents claim only unsubstituted alkoxy substituents dictates our conclusion on the related issue of literal infringement. Thus, we hold that hexaflumuron and noviflumuron do not literally infringe Defendants' patents. Since hexaflumuron and noviflumuron both contain phenyl groups substituted with

---

[22] See, supra, note 1 for an expanded list of said motions.

[23] Statements that Dow sought or received regarding whether hexaflumuron or noviflumuron literally infringed Defendants' patents are not relevant to our determination of whether those compounds actually infringe Defendants' patents since the structure of the compounds is not in dispute.

alkoxy substituents, which in turn are substituted with halogens, they cannot be considered to literally infringe patents which encompass only unsubstituted alkoxy substituents. Accordingly, Dow is entitled to partial summary judgment on the issue of literal infringement of Defendants' patents.

      B.    *Inapplicability of the doctrine of equivalents*.

Finally, our conclusion that Defendants' patents claim only unsubstituted alkoxy substituents also compels a ruling that hexaflumuron and noviflumuron do not infringe Defendants' patents under the doctrine of equivalents. Our understanding of controlling Federal Circuit precedent on this principle is that a finding of infringement under the doctrine of equivalents cannot "vitiate" a claim limitation. See Novartis Pharmaceuticals Corp. v. Eon Labs Mfg., Inc., 363 F.3d 1306, 1312 (Fed. Cir. 2004) (stating: "To extend the scope of the claims at issue to encompass a dispersion formed inside the stomach would necessarily read the 'hydrosol' limitation out of those claims") (citing Moore U.S.A., Inc. v. Standard Register Co., 229 F.3d 1091, 1106 (Fed. Cir. 2000); Conopco, Inc. v. May Dep't Stores Co., 46 F.3d 1556, 1562 (Fed. Cir. 1994); Dolly, Inc. v. Spalding & Evenflo Cos., Inc., 16 F.3d 394, 398 (Fed. Cir. 1994) (holding that "[t]he doctrine of equivalents is not a license to ignore claim limitations")). As was true in Novartis, so it is here, in the sense that the relevant claim limitation was added by the court during claim construction.

Assuming *arguendo* that we were to conclude that hexaflumuron and/or noviflumuron infringed Defendants' patents under the doctrine of equivalents, that

conclusion would vitiate our decision on claim construction, namely, that the term "alkoxy" only includes unsubstituted alkoxy groups.  Therefore, consistent with the holding in the <u>Novartis</u> decision, we are precluded from applying a doctrine of equivalents analysis which would read into the claims the additional molecules which our prior claim construction ruling specifically excluded.  Accordingly, Dow is entitled to summary judgment on its argument that hexaflumuron and noviflumuron do not infringe Defendants' patents under the doctrine of equivalents.[24]

<u>Conclusion</u>

For the foregoing reasons, we conclude that the proper construction of the disputed term of the patents in suit is as follows:

| **Claim Term** | **Definition** |
|---|---|
| "alkoxy group" [Claim 1 of the '044, '151 and '064 patents; Claim 2, '064 patent] | An unsubstituted alkyl radical attached to the remainder of the molecule by oxygen. |

As a result of this claim construction, Dow's compounds, hexaflumuron and noviflumuron, do not infringe Defendants' patents, either literally or under the doctrine of equivalents.  Accordingly, Plaintiff's Motion for Partial Summary Judgment on the issues of literal infringement and infringement under the doctrine of equivalents is <u>GRANTED</u>

---

[24] Defendants mistakenly believe that expert opinions and reports concerning the significance of the differences between substituted and unsubstituted alkoxy groups and/or the "function, way, and result" of Plaintiff's compounds can create a material fact for trial. However, as explained above, Federal Circuit precedent precludes a finding of infringement under the doctrine of equivalents regardless of the evidence produced by Defendants.

and Defendants' Motion for Partial Summary Judgment is <u>DENIED</u>.  IT IS SO

ORDERED.



Date: _07/06/2005_____                    _Sarah Evans Barker_____

                                              SARAH EVANS BARKER, JUDGE
                                              United States District Court
                                              Southern District of Indiana

Copy to:

Helen K. Geib                                  Deborah Pollack-Milgate
BARNES & THORNBURG                             BARNES & THORNBURG
helen.geib@btlaw.com                           dmilgate@btlaw.com

Carrie Rene Grandinetti                        Cameron Sean Reuber
LEVY & GRANDINETTI                             LEVY & GRANDINETTI
mail@levygrandinetti.com                       mail@levygrandinetti.com

Paul Grandinetti                               Todd G. Vare
LEVY & GRANDINETTI                             BARNES & THORNBURG
mail@levygrandinetti.com                       todd.vare@btlaw.com

Donald E. Knebel                               Donn H. Wray
BARNES & THORNBURG                             STEWART & IRWIN
donald.knebel@btlaw.com                        dwray@stewart-irwin.com

William E. Padgett
BARNES & THORNBURG
william.padgett@btlaw.com